**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Zayat Stables, LLC,
Debtor-in-Possession

| | | |
|---|---|---|
| In re: | : | UNITED STATES BANKRUPTCY COURT |
| | : | FOR THE DISTRICT OF NEW JERSEY |
| ZAYAT STABLES, LLC, | : | HONORABLE DONALD H. STECKROTH |
| | : | CASE NO. 10-13130 (DHS) |
| Debtor-in-Possession. | : | |
| | : | ADV. PRO NO. 10- |
| ZAYAT STABLES, LLC, | : | |
| | : | |
| Plaintiff, | : | Chapter 11 |
| | : | |
| v. | : | |
| | : | **ADVERSARY PROCEEDING** |
| FIFTH THIRD BANK, | : | **COMPLAINT** |
| | : | |
| Defendant. | : | |
| | : | |

Plaintiff and the within debtor and debtor-in-possession, Zayat Stables, LLC ("Zayat

Stables"), by and through its counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A., as and for

its complaint against defendant, Fifth Third Bank (the "Bank"), states as follows:

### I.    <u>Introduction</u>

1.      Zayat Stables, a leading owner of thoroughbred race horses in North America,

brings this adversary proceeding for damages, a declaratory judgment and other relief in

connection with multi-million dollar lender liability claims arising out of a long-standing pattern

of misleading, deceptive and predatory lending practices perpetrated by the Bank in connection

with seven (7) commercial loan facilities issued to Zayat Stables.  As explained below, through a host of empty promises and without regard for Zayat Stables' rights, the Bank and its senior officers and representatives manipulated and positioned Zayat Stables for certain failure, which triggered a chain of events resulting in acceleration of Zayat Stables' entire loan portfolio -- undertaken for the sole and unlawful purpose of prematurely ousting Zayat Stables from the Bank.

2.       In reliance on the Bank's numerous promises to restructure, re-amortize and extend the loans, which promises and representations were confirmed in a signed writing by a senior Bank officer, Zayat Stables discontinued efforts to prepare its thoroughbred horses for sale at auction and refrained from undertaking measures to enable itself to satisfy its maturing loans. After Zayat Stables' opportunity to liquidate assets had long passed, the Bank abruptly reversed its position, breached the parties' agreement and accelerated the obligations under the loans, which otherwise would not have come due absent the Bank's breach of promises and Zayat Stables' reliance thereon.

3.       To guard against the Bank's and deceptive practices, Zayat Stables seeks, among other relief, an award of compensatory, consequential and punitive damages against the Bank in an amount to be established at trial.  Zayat Stables also seeks entry of a decree declaring and adjudging: (a) that a valid, binding, and enforceable agreement exists between the parties to restructure, re-amortize and extend the loans; (b) that all defaults declared by the Bank and the acceleration of the loans (and attendant expenses wrongfully incurred) are void, unenforceable and of no force or legal effect; (c) that no principal, interest, default interest or other payments are presently due and owing from Zayat Stables to the Bank with respect to the loans; and (d) for such other and further relief as the Court deems just and proper.

48051/0001-6419245v5

## II.    Jurisdiction and Venue

4.    On February 3, 2010 (the "Filing Date"), Zayat Stables filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").  Since the Filing Date, Zayat Stables has remained in possession of its assets and continued management of its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

6.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K) and (O).

7.    Venue lies properly in this district pursuant to 28 U.S.C. § 1409(a) because this adversary proceeding arises in or is related to the above-captioned Chapter 11 case.

## III.    The Parties

8.    Zayat Stables is a limited liability company formed and existing under the laws of Delaware with offices located at 401 Hackensack Avenue, Seventh Floor, Hackensack, New Jersey, 07601.  Ahmed Zayat ("Mr. Zayat") is the sole member and operating manager of Zayat Stables.  Zayat is also a co-guarantor of certain loans issued by the Bank.

9.    Upon information and belief, the Bank is a financial institution chartered and existing under the laws of the State of Michigan with its principal place of business located at 250 West Main Street, Lexington, Kentucky, 40507.

## IV.    Background

10.    Zayat Stables, which was founded in 2005 by Mr. Zayat, is the leading owner of thoroughbred race horses in North America.  In its relatively short history, Zayat Stables has achieved success at the highest level of racing with 39 individual stake winners, 48 stake wins

48051/0001-6419245v5

and 28 graded stake wins.  In 2008, Zayat Stables earned purse winnings of $6.9 million, more

than any other racing stable in North America.

11.     This dispute arises in connection with a series of seven (7) commercial loans

issued by the Bank to Zayat Stables over a course of approximately 15 months commencing in

August 2007, with the most recent loan issued to Zayat Stables in January 2009 (the "Loans").

An overview of the various Loans is set forth below:

| Date of Issuance | Original Principal Amount | Original Stated Maturity Date |
|---|---|---|
| August 1, 2007 | $10,000,000.00 | July 31, 2009 |
| February 25, 2008 | $2,700,000.00 | March 1, 2010 |
| April 1, 2008 | $6,000,000.00 | March 1, 2012 |
| April 1, 2008 | $10,000,000.00 | December 20, 2011 |
| April 1, 2008 | $3,945,970.00 | December 15, 2011 |
| September 23, 2008 | $3,000.000.00 | March 1, 2009 |
| January 14, 2009 | $3,000,000.00 | January 1, 2010 |

12.     As reflected above, from August 2007 to January 2009, the Bank issued Loans to

Zayat Stables in the aggregate principal amount of $38,645,970.00.  The proceeds of the Loans

were utilized as operating capital in connection with Zayat Stables' thoroughbred operations

including the acquisition of various thoroughbreds.  The Loans are securitized by Zayat Stables'

thoroughbreds and guaranteed by Mr. Zayat.  In addition, Mr. Zayat has personally invested in

excess of $40 million in the Debtor to develop its business and ensure its success.

## V.      The Parties' Course of Dealing With Respect to the Re-amortization of the Loans

13.     In late 2008 and early 2009, as a result of the ongoing credit crisis and economic

recession and a continuing correction of pricing in the equine auction marketplace, it became

apparent to Zayat Stables that it was necessary to restructure the existing indebtedness associated

with the Loans, which at that time totaled at least $28 million.

4

14.    Zayat Stables approached the Bank's Assistant Vice President of the Equine

Lending Division, Chad Lashbrook ("Mr. Lashbrook"), to discuss a re-amortization and

restructuring of the Loans.  Since commencement of the Bank's lending relationship with Zayat

Stables, Mr. Lashbrook served as assistant to the Bank's Senior Equine Lending Officer, Ted

Berge ("Mr. Berge").  Mr. Berge was responsible, in the first instance, for originating and

structuring  Zayat Stables' financing facility.  Upon Mr. Berge's departure from the Bank in

2008, Mr. Lashbrook assumed primary responsibility for Zayat Stables' loan portfolio.

15.    Mr. Lashbrook assured Zayat Stables the Bank would agree to restructure the

indebtedness and extend the maturity dates of the Loans.  At the time the parties began these

discussions, and through at least the first quarter of 2009, the Bank appraised the horse collateral

at approximately $90 million, which was substantially in excess of the $28 million in

indebtedness.

16.    At the outset of these discussions, and throughout 2008 and early 2009, Zayat

Stables repeatedly informed the Bank that absent a re-amortization of the Loans, its existing cash

flow would be insufficient to service any additional indebtedness, notwithstanding the fact Zayat

Stables possessed the collateral value to protect the Loans.

17.    The parties' discussions in late 2008 and early 2009 were consistent with their

prior negotiations and course of dealing with respect to modifying and/or restructuring certain of

the Loans.  For instance, and without limitation, as reflected in correspondence between Zayat

Stables and Mr. Berge during January and February 2008, at all times, the Bank understood that

the ability and willingness of Zayat Stables to assume additional indebtedness was contingent

upon an overall re-amortization of its existing indebtedness.  That correspondence provides, in

pertinent part, as follows:

5

*January 14, 2008 Email from Sobhy Sonbol to Ted Berge*

Dear Ted,

I am following up on the amortization request.  Thank you for looking in to it for me and I hope that Sandra is now back to start the process.  I am having trouble trying to forecast my cash flow as this request plays a major role in it.  **We started this process last October with the request and we took the new loan with the understanding that the dates will change** . . . .

*January 14, 2008 Email from Ted Berge In Response*

**Sandi is starting on it**.

*February 20, 2008 Email from Sobhy Sonbol to Ted Berge*

Ted, thank you very much for all your help.  Just for the sake of good order I would like to sign formal loan document (sic) for the new note you approved purchasing two year olds in the amount of $2.75MM.  **I would also appreciate your kindness and help in expediting your under writing department to send us the documents regarding the re amortization of all existing loans in the amount of $28.5MM**…

18.    In response to this and similar requests to re-amortize the indebtedness, Zayat Stables was repeatedly assured throughout 2008 and into the first quarter of 2009 that the appropriate documents to restructure, extend and re-amortize the Loans were "under way" and would be forthcoming.  At no point in time prior to March 2009, did Mr. Berge, Mr. Lashbrook or any other Bank representative advise Zayat Stables that the Bank was unwilling to re-amortize the existing indebtedness or had declined to extend the maturity dates of the Loans.  Indeed, in or about April 2008, the Bank extended and re-amortized certain Loans in furtherance of the bilateral agreement that Zayat Stables would borrow additional sums of money from the Bank solely on the condition that, and in exchange for which, the Bank would extend, restructure and re-amortize the Loans.

19.     During 2008 and 2009, the economy continued to decline and Zayat Stables communicated to the Bank again in late 2008 and early 2009 that the extension and re-amortization of the Loans was necessary.  As reflected in correspondence dated December 14, 2008, Zayat Stables again agreed to borrow from the Bank $3-$5 million of additional funds for working capital and acquisition of horses subject to an extension and re-amortization of the Loans.  The e-mail provides, in pertinent part, as follows:

> I really need your support now more than ever.  An immediate bridge loan or a new facility loan of 3-5MM dollar loan (against stallion division) and **the second thing would be helpful being to postpone the payment of the note due in march to another year** …

20.     In connection with this financing request and as a condition to borrowing additional funds, Zayat Stables sought confirmation that the Bank intended to extend the September 23, 2008 term note that was maturing on March 1, 2009, which the Bank confirmed.

21.     On January 14, 2009, the Bank extended an additional $3 million of financing to Zayat Stables to be due and payable on January 1, 2010.  As was the case with prior Loans, Zayat Stables accepted these proceeds with the understanding and expectation that the existing indebtedness would be restructured over several years.

22.     Contrary to the Bank's promises and representations, upon which Zayat Stables reasonably relied in accepting the January 14, 2009 note, in March 2009, Mr. Lashbrook first advised Zayat Stables that the Bank's "credit approvers" were unwilling to postpone maturity of the September 28, 2008 term note as initially agreed.  As reflected in Mr. Lashbrook's March 25, 2009 correspondence, the Bank's decision was precipitated by Mr. Lashbrook's purported failure to obtain approval from the Bank's Credit Committee in connection with the January 14, 2009 note.  That correspondence provides, in pertinent part, as follows:

48051/0001-6419245v5

> Guys, our credit approvers have become aware of the additional $3
> million advanced in December and are unwilling to push back on
> the $3 million March payment to the end of the year.  There is
> absolutely no way around this.  I have been fighting them on this
> for nearly three weeks now, and these are the options they are
> willing to accept…**I warned that something like this could
> happen when we went behind their backs to extend the
> additional $3 million in December**.  We have no more ability to
> supersede their authority…

23.      Contrary to the statements contained in Mr. Lashbrook's correspondence, at no

time was Zayat Stables aware that the January 14, 2009 note had been issued without the

approval of the Bank's Credit Committee.  At all times, Zayat Stables reasonably believed that

Lashbrook possessed complete authority to both approve the January 14, 2009 Loan and extend

the maturity date on the September 23, 2008 Note.  With this turn of events, the Bank retreated

on its promise to restructure the indebtedness as initially contemplated and agreed to by the

parties, notwithstanding the fact Zayat Stables had agreed to accept the $3 million of additional

indebtedness with the understanding the Bank would re-amortize the entire Loan portfolio.

24.      In response to the Bank's refusal to honor its promises, by correspondence dated

March 25, 2009, Zayat Stables informed the Bank, in no uncertain terms, that its conduct was

"unacceptable" and "in total contradiction" of the parties' agreement.  That correspondence

provides, in pertinent part, as follows:

> Chad:
>
> I am shell shocked with this kind of e-mail from yourself.  It is in
> total contradiction to our agreement.  As you are well aware, we
> just borrowed $3MM as a lifeline the Bank knowing exactly that
> we have a cash flow crunch and we demanded that the March
> payment be rescheduled in order to avoid any problem.  We also
> agreed with you and we have enough e-mails and
> documentation…and in our discussion with other officers at the
> Bank that the only payment for all loans will be a one payment at
> the end of the year for $10MM dollars.  To come and change the
> game plan and the rules is totally unacceptable and crazy and
> literally throws my whole stable in financial jeopardy.

8

25.     In an effort to avoid certain liability for its actions, the Bank agreed to reconsider its position with respect to extending the maturity date of the September 23, 2008 term note and refocused on reaching a global agreement on a re-amortization of the Loan portfolio.  Over the next several months, the parties continued to negotiate the restructuring and extension agreement.

### VI.    The Bank's Underhanded Efforts to Force Zayat Stables Out of The Bank

26.     While Debtor was optimistic that an agreement on the terms of a global re-amortization of the Loans would be reached, out of an abundance of caution, in mid-2009, Zayat Stables initiated the process necessary to prepare to sell sixty-seven (67) thoroughbreds at the Keeneland Association, Inc. ("Keeneland") auctions scheduled for September and November 2009.  The necessary preparations involved a lengthy process consisting of, among other things: x-rays of all horses, transporting horses from all over the country to the sale location (which requires logistical planning and payments to shippers and cessation of training programs for such horses) and special exercise and training programs designed to enhance the horses' best and most attractive features for the auction.

27.     While, given the depressed market conditions, Zayat Stables would have preferred to retain many, if not most, of the horses until market conditions improved, it was nonetheless resigned, if necessary, to participate in these auctions to raise the funds needed to bring itself fully current on the Loans on the outside chance the Bank rescinded its agreement to restructure, extend and re-amortize the Loans.

28.     At Zayat Stables' request, a meeting occurred on June 29, 2009, at the Bank's headquarters in Cincinnati, Ohio for the purpose of discussing the terms of a global restructuring agreement.  Based upon existing cash flow needs and Zayat Stables' projected earnings, Zayat Stables proposed a restructuring of the existing indebtedness based upon a $7 million end-of-

year principal pay down with a five (5) year amortization of the remaining indebtedness.  This

proposal was presented by Zayat to the Bank's senior executives, including David Haas ("Mr.

Haas"), Lauris Turck, Charles Fultes, and Bob Heiple ("Mr. Heiple").  In the event the Bank

declined to accept the proposal, Zayat Stables intended to continue preparing its horses for the

September 2009 and November 2009 auctions to raise the capital necessary to satisfy its

maturing Loans.

29.     On the surface, the Bank appeared to be receptive to Zayat Stables' proposal and

displayed optimism that approval would be forthcoming.  In reality, however, and unbeknown to

Zayat Stables, Bank officers were surreptitiously developing a strategy to force Zayat Stables out

of the Bank by: (a) eliminating Zayat Stables' ability to raise the capital necessary to satisfy its

maturing Loans; and (b) rescinding its commitment to re-amortize, restructure and extend the

Loans, thus triggering a chain of events that would ultimately result in acceleration of the entire

Loan portfolio.

30.     In the days that followed the June 29, 2009 meeting, Zayat Stables eagerly

awaited a decision concerning the restructuring proposal unaware of the Bank's nefarious

agenda.  After much anticipation, by correspondence dated July 9, 2009, Zayat Stables received

written confirmation, electronically signed by Mr. Lashbrook, advising the Bank had accepted

and approved its proposal to restructure, re-amortize and extend the Loans based upon a $7

million year-end principal pay down and five (5) year amortization of the remaining principal

Loan balance.  That documentation provides, in pertinent part, as follows:

> Bob spoke with Dave Haas about a new amortization schedule
> yesterday after our meeting.  **Haas indicated that he approved of
> the $7MM pay down this year and a five year amortization of
> the remaining balance.**  A credit write-up is underway.

*Chad Lashbrook*

31.    For Zayat Stables, the Bank's written commitment to re-amortize the Loans was

significant for several reasons: (a) it relieved Zayat Stables from the task of raising the cash

necessary to satisfy its maturing indebtedness; (b) it negated the need for Zayat Stables to sell its

horses at auction while exposed to less than favorable market conditions; and (c) it eliminated

the need for Zayat Stables to continue to incur costly expenses associated with the preparation of

its horses for sale at the auctions.  As such, and in reliance on the Bank's agreement to re-

amortize the Loans, Zayat Stables immediately ceased all preparations of the horses for sale.

32.    On its face, the Bank's written commitment to re-amortize the Loans appeared

legitimate, leaving Zayat Stables no reason to suspect any impropriety on the Bank's behalf.

Internal Bank records demonstrate, however, that just forty-eight (48) hours before it agreed, in

writing, to accept Zayat Stables' proposal, Bank officers reaffirmed the Bank's continuing

strategy to "exit" Zayat Stables from the Bank "as quickly as possible."

33.    While continuing to impress upon Zayat Stables a sense of false security arising

from the contemplated restructuring of the Loans, the Bank secretly continued to position itself

to accelerate the Loan portfolio and terminate its relationship with Zayat Stables.  In so doing, on

August 28, 2009, the Bank issued to Zayat Stables a notice of default (the "Notice of Default").

To defuse the true purpose of this Notice of Default, the Bank's senior work-out officers, Keith

Goodpaster ("Mr. Goodpaster") and David Verville ("Mr. Verville"), assured Zayat that he

"shouldn't worry," about receiving the Notice of Default, explaining the Notice of Default was

only a formality that is mandated by Bank policy once a loan is transferred from the Lending

Division to the Work-out Division.

34.    To quell any concerns Zayat may have had, Mr. Goodpaster and Mr. Verville

highlighted for Zayat the provisions in the Notice of Default reflecting the fact  a "deal in

11

principle" had been reached by the parties.  Mr. Goodpaster and Mr. Verville further explained to

Zayat the Notice of Default was intended to outline a timeline to of events leading to the closing

of the transaction.  In reliance on these representations, Zayat Stables disregarded the Notice of

Default insofar as it purported to indicate Zayat Stables' alleged non-compliance with the Loans'

payment obligations.  Significantly, at no time did Zayat Stables believe the Bank intended to

abandon its promises or otherwise seek to place Zayat Stables in financial jeopardy.

   35. On or about September 15, 2009, at a meeting between Mr. Goodpaster and Mr.

Verville, and Mr. Zayat and Mr. Sonbol, in Lexington, Kentucky, Mr. Goodpaster and Mr.

Verville reaffirmed the Bank's commitment to reamortize the Loans as promised in the July 9,

2009 email, but informed Zayat that it was necessary to slightly modify the terms to reflect: (a) a

reduction in the amortization period from five (5) years to three (3) years; and (b) a reduction in

the amount of the year-end principal pay down from $7 million to $5 million.  Although Zayat

was not pleased by this modification, due to the fact the preparation of the horses for sale at

auction had ceased, Zayat reluctantly agreed to the modified terms.  The Bank representatives

continued to assure Zayat Stables that the agreed upon re-amortization of the Loans would be

finalized promptly, negating the need for Zayat Stables to liquidate horses at the auction.

   36. During the meeting on September 15, 2009, the parties also discussed Zayat

Stables' purchase of additional horses.  In reliance on assurances that the agreed upon re-

amortization of the Loans would be promptly finalized, Zayat Stables, with the Bank's

knowledge and assent, borrowed $3.2 million from Keeneland to purchase additional horses.  In

further reliance on the parties' agreement, Zayat Stables paid the Bank $3.3 million ($2 million

on September 25, 2009 and $1.3 million on November 16, 2009) of the agreed-upon $5 million

year-end principal pay down, which the Bank accepted notwithstanding the fact Bank

representatives had no intention of honoring their promises.

37.    Notwithstanding the parties' agreement, as evidenced by the July 9, 2009

correspondence signed by Bank officer Chad Lashbrook (as subsequently modified) without

justification or cause, the Bank ultimately failed and refused to implement the agreed-upon

restructuring, re-amortization and extension of the Loan portfolio, to the substantial detriment of

Zayat Stables and issued a notice to Zayat Stables on December 14, 2009, purporting to

accelerate the entire Loan portfolio.

## COUNT ONE
### (Breach of Contract)

38.    Zayat Stables repeats and realleges each and every allegation contained in the

prior paragraphs of the Complaint as though set forth at length herein.

39.    As set forth above, on June 29, 2009, Zayat Sables presented the Bank with an

offer upon which to restructure, re-amortize and extend the Loan portfolio based upon a

$7 million year-end principal payment and five (5) year amortization of the remaining balance of

the Loans.

40.    By correspondence dated July 9, 2009, Bank Assistant Vice President, Chad

Lashbrook, upon whom the Bank had conferred actual and/or apparent authority to bind the

Bank, conveyed to Zayat Stables the Bank's acceptance and approval of Zayat Stables' offer,

thus establishing mutual assent between the parties with respect to the re-amortization,

restructuring and extension of the Loan portfolio.

41.    In reliance on the Bank's promise and written acceptance of Zayat Stables' offer,

which the Bank should have reasonably expected to induce action and/or forbearance on the part

of Zayat Stables, Zayat Stables discontinued efforts to prepare its thoroughbreds for sale at

13

auction.  In so doing, Zayat Stables reasonably relied on the Bank's promise to its substantial detriment.

42.     Notwithstanding the parties' agreement, as evidenced by the July 9, 2009 correspondence signed by Bank officer Chad Lashbrook, as such agreement was otherwise modified by the parties, without justification or cause, the Bank failed to implement the agreed-upon restructuring, re-amortization and extension of the Loan portfolio.

43.     As a direct and proximate result of the Bank's breach of the parties' agreement, as aforesaid, Zayat Stables has and will continue to suffer substantial harm.

WHEREFORE, Zayat Stables respectfully requests entry of judgment against the Bank for compensatory damages, punitive damages, interest, attorneys' fees and costs and such other and further relief as the Court deems just and equitable.

## COUNT TWO
## (Promissory Estoppel)

44.     Zayat Stables repeats and realleges each and every allegation contained in the prior paragraphs of the Complaint as though set forth at length herein.

45.     On numerous occasions, including, without limitation, July 9, 2009 and September 15, 2009, Bank representatives including, without limitation, Chad Lashbrook, Keith Goodpaster and David Haas, represented, promised and assured Zayat Stables that all existing Loans would be restructured, re-amortized and extended and further represented to Zayat Stables that in lieu of satisfying maturing and/or matured Loans, a year-end principal payment of no more than $7 million (which was later reduced to $5 million) would be accepted by the Bank in connection with the parties' agreement to restructure, re-amortize and extend the Loan portfolio.

46.     In reasonable and justifiable reliance on the Bank's promises, representations and assurances, as aforesaid, Zayat Stables discontinued the process of preparing its thoroughbreds

14

for sale at auction, thereby leaving Zayat Stables without the ability to raise the cash necessary to satisfy its matured and/or maturing Loans.

47.    In making said promises, representations and assurances, the Bank intended to induce Zayat Stables to rely thereon for the sole and unlawful purpose of accelerating all Loans, exiting Zayat Stables from the Bank and closing down its equine lending business.

48.    In reasonable and justifiable reliance on the Bank's promises and assurances, as aforesaid, Zayat Stables materially changed its position and refrained from implementing measures to protect itself from the occurrence of a default under the Loans.

49.    In further reliance on the Bank's promises, Zayat Stables obtained additional financing and incurred additional debt with the understanding and expectation the Bank would honor its commitment to reamortize, restructure and extend the Loans.  Absent the Bank's promises, Zayat Stables would never have agreed to obtain additional financing and would have refrained from exposing itself to additional indebtedness.

50.    But for the promises and assurances of the Bank, upon which Zayat Stables reasonably relied to its detriment, Zayat Stables could have avoided the occurrence of a default under the Loans.

51.    By reason of the Bank's failure and refusal to honor its promises and assurances, as aforesaid, Zayat Stables has been subjected to substantial harm and relief is necessary to avoid injustice and achieve equity.

WHEREFORE, Zayat Stables respectfully requests entry of judgment against the Bank for compensatory damages, punitive damages, interest, attorneys' fees and costs and such other and further relief as the Court deems just and equitable.

## COUNT THREE
### (Equitable Estoppel)

52.     Zayat Stables repeats and realleges each and every allegation contained in the prior paragraphs of the Complaint as though set forth at length herein.

53.     On numerous occasions, including, without limitation, July 9, 2009 and September 15, 2009, Bank representatives including, without limitation, Chad Lashbrook, Keith Goodpaster and David Haas, represented, promised and assured Zayat Stables that all existing Loans would be restructured, re-amortized and extended and further represented to Zayat Stables that in lieu of satisfying maturing and/or matured Loans, a year-end principal payment of no more than $7 million (which was later reduced to $5 million) would be accepted by the Bank in connection with the parties' agreement to restructure, re-amortize and extend the Loan portfolio.

54.     During the time of these representations and promises, the Bank internally strategized to reduce its own exposure as much and as quickly as possible in an effort to exit Zayat Stables from the Bank and close its equine lending division.  The Bank concealed this information from Zayat Stables.

55.     The Bank concealed material facts and made false representations, as aforesaid, to Zayat Stables which conveyed to Zayat Stables the impression the facts and circumstances were otherwise than what they seemed.

56.     At all times the Bank knew and/or should have reasonably expected that said representations and promises would reasonably induce or influence Zayat Stables to discontinue the process of preparing its thoroughbreds for sale at auction, thereby leaving Zayat Stables without the ability to raise the cash necessary to satisfy its matured and/or maturing Loans.

57.     In further reliance on the Bank's promises, Zayat Stables obtained additional financing and incurred additional debt with the understanding and expectation the Bank would

16

honor its commitment to reamortize, restructure and extend the Loans.  Absent the Bank's promises, Zayat Stables would never have agreed to obtain additional financing and would have refrained from exposing itself to additional indebtedness.

58.     Zayat Stables lacked the means of knowing the truth as to the facts in question.

59.     But for the promises and assurances of the Bank, upon which Zayat Stables reasonably relied to its detriment, Zayat Stables could have avoided the occurrence of a default under the Loans.

60.     By reason of the Bank's failure and refusal to honor its promises and assurances, as aforesaid, Zayat Stables has been subjected to actual, material and substantial harm and relief is necessary to avoid injury, detriment and prejudice.

WHEREFORE, Zayat Stables respectfully requests entry of judgment against the Bank for compensatory damages, punitive damages, interest, attorneys' fees and costs and such other and further relief as the Court deems just and equitable.

## COUNT FOUR
### (Declaratory Relief)

61.     Zayat Stables repeats and realleges each and every allegation contained in the prior paragraphs of the Complaint as though set forth at length herein.

62.     An actual and justiciable controversy has arisen and now exists between the Bank and Zayat Stables concerning their respective rights and duties with respect to the Loans in that:

(a)     The Bank contends that Zayat Stables has defaulted in the payment of principal, interest and other charges purportedly due in connection with the Loans and, consequently, that the Bank is entitled, *inter alia*, to exercise and enforce its rights and remedies against Zayat Stables under the applicable loan documents.

48051/0001-6419245v5

(b)    Zayat Stables contends, to the contrary, that the Bank must be precluded and estopped from exercising and enforcing its rights and remedies against Zayat Stables by virtue of: (a) the parties' agreement to restructure, re-amortize and extend the Loans; (b) the Bank's promise to restructure, re-amortize and extend the Loans, upon which Zayat Stables reasonably and justifiably relied to its substantial detriment; and (c) the Bank's fraudulent misrepresentations of existing fact arising out of its intent not to implement and/or honor the agreed-upon restructuring, re-amortization and extension of the Loans.

63.    A judicial declaration is necessary and appropriate at this time under the circumstances to enable Zayat Stables to ascertain its rights and duties, if any, with respect to the Loans.

WHEREFORE, Zayat Stables seeks judgment against the Bank for a judicial determination adjudging and declaring: (a) a valid, binding, and enforceable agreement exists between the parties for the restructuring, re-amortization and extension of the Loans in accordance with the July 9, 2009 correspondence, as thereafter modified by the parties on September 15, 2009; (b) all Events of Default declared by the Bank with respect to the Loans, as well as the acceleration thereof, are void, unenforceable and of no force or legal effect; (c) that no principal, interest, default interest or other payments are presently due and owing from Zayat Stables to the Bank with respect to the Loans; and (d) for such other and further relief as the Court deems just and proper.

## COUNT FIVE
**(Intentional Misrepresentation)**

64.    Zayat Stables repeats and realleges each and every allegation contained in the prior paragraphs of the Complaint as though set forth at length herein.

18

65.    On numerous occasions, including, without limitation, July 9, 2009 and September 15, 2009, Bank representatives including, without limitation, Chad Lashbrook, Keith Goodpaster and David Haas, represented, promised and assured Zayat Stables that all existing Loans would be restructured, re-amortized and extended and further represented to Zayat Stables that in lieu of satisfying maturing and/or matured Loans, a year-end principal payment of no more than $7 million (which was later reduced to $5 million) would be accepted by the Bank in connection with the parties' agreement to restructure, re-amortize and extend the portfolio.

66.    The aforesaid promises, representations and assurances, were made by Bank representatives with full knowledge of their falsity and communicated to Zayat Stables and Zayat with the present intention not to perform and/or implement the promised restructuring, re-amortization and extension of the Loan portfolio.

67.    In reasonable and justifiable reliance on the Bank's promises, representations and assurances, as aforesaid, Zayat Stables discontinued the process of preparing its thoroughbreds for sale at auction, thereby leaving Zayat Stables without the ability to raise the cash necessary to satisfy its matured and/or maturing Loans.

68.    In making said promises, representations and assurances, the Bank intended to induce Zayat Stables to rely thereon for the sole and unlawful purpose of accelerating all Loans, exiting Zayat Stables from the Bank and closing down its equine lending business.

69.    In further reliance on the Bank's promises, Zayat Stables obtained additional financing and incurred additional debt with the understanding and expectation the Bank would honor its commitment to reamortize, restructure and extend the Loans.  Absent the Bank's promises, Zayat Stables would never have agreed to obtain additional financing and would have refrained from exposing itself to additional indebtedness.

70.    The Bank's conduct, as aforesaid, was willful, wanton and in reckless disregard of Zayat Stables' rights and was otherwise wrongful.

71.    By virtue of the Bank's deceitful conduct and affirmative misrepresentations of existing fact, as aforesaid, Zayat Stables has and will continue to suffer substantial damages.

WHEREFORE, Zayat Stables respectfully requests entry of judgment against the Bank for compensatory damages, punitive damages, interest, attorneys' fees and costs and such other and further relief as the Court deems just and equitable.

## COUNT SIX
**(Breach Of The Implied Covenant Of Good Faith And Fair Dealing By The Bank)**

72.    Zayat Stables repeats and realleges each and every allegation contained in the prior paragraphs of the Complaint as though set forth at length herein.

73.    Implied in every contract under Kentucky law is a covenant of good faith and fair dealing, which prohibits, among other things, contracting parties from frustrating another party's ability to perform under the contract.

74.    The Bank's intentional misrepresentations, as stated above, all of which were made in bad faith, relating to the contemplated restructuring and extension of the Loans, frustrated Zayat Stables' ability to perform its purported obligations with respect to the Loans, thus constituting a material breach of the implied covenant of good faith and fair dealing.

75.    The Bank's conduct, as aforesaid, was willful, wanton and in reckless disregard of Zayat Stables' rights and was otherwise wrongful.

76.    As a direct and proximate result of the Bank's breach of the implied covenant of good faith and fair dealing, Zayat Stables has and will continue to suffer substantial damages.

48051/0001-6419245v5

WHEREFORE, Zayat Stables respectfully requests entry of judgment against the Bank for compensatory damages, punitive damages, interest, attorneys' fees and costs and such other and further relief as the Court deems just and equitable.

## COUNT SEVEN
### (Determining Extent, Validity and Priority of the Bank's Security Interest in and Lien on the Debtor's Assets)

77.     Zayat Stables repeats and realleges each and every allegation contained in the prior paragraphs of the Complaint as though set forth at length herein.

78.     As a result of the Bank's fraudulent and wrongful conduct as aforesaid, and Keeneland's competing interest by virtue of its purported security interest in Zayat Stables' assets, Zayat Stables requires a determination of the extent, validity and priority of the Bank's lien pursuant to 11 U.S.C. § 506(a)(1).

WHEREFORE, Zayat Stables respectfully requests entry of a judgment directing the Bank to prove the validity, extent and priority of its alleged perfected security interest and lien on the Debtor's assets and awarding such other and further relief as the Court deems equitable and proper.

## COUNT EIGHT
### (Equitable Subordination – Section 510(c))

79.     Zayat Stables repeats and realleges each and every allegation contained in the prior paragraphs of the Complaint as though set forth at length herein.

80.     Based on the Bank's knowledge, acts and omissions as described herein, under principles of equitable subordination, it would be inequitable for the Bank's claim to receive distribution on a superior or equal level to the claims of investors and other creditors in this proceeding.

48051/0001-6419245v5

81.    The Bank's inequitable conduct described above resulted in substantial injury to the Debtor and its estate.

82.    Equitable subordination of the Bank's claim is warranted and is not inconsistent with any provision of the Bankruptcy Code.

WHEREFORE, Zayat Stables respectfully requests entry of judgment: (i) subordinating for purposes of distribution all of the Bank's allowed claims, if any, to the claims of all investors and other creditors in this proceeding pursuant to Section 510(c)(1) of the Bankruptcy Code, (ii) for an Order directing that any lien securing the Bank's subordinated claims be transferred to the Debtor's bankruptcy estate pursuant to Section 510(c)(2) of the Bankruptcy Code, (iii) for attorneys' fees and costs of suit, and (iv) for such other and further relief as is just and proper.

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Zayat Stables, LLC, Plaintiff

By: */s/ Michael D. Sirota*
Michael D. Sirota
Warren A. Usatine

DATED:  April 5, 2010

48051/0001-6419245v5